# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| QIANA KEITH, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | FILE NO. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| GEORGIA REPUBLICAN PARTY; | ) | |
| GEORGIA REPUBLICAN PARTY, | ) | |
| INC.; and JOHN PADGETT, in his | ) | |
| capacity as Chairman of the Georgia | ) | |
| Republican Party and Georgia | ) | |
| Republican Party, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1.     Plaintiff Qiana Keith ("Ms. Keith" or "Plaintiff") respectfully submits the following Complaint against Defendants Georgia Republican Party and Georgia Republican Party, Inc. (referred to collectively herein as the "Party"), and John Padgett ("Padgett"; referred to collectively with the "Party" as "Defendants"), alleging violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII").

**INTRODUCTION**

2.     Ms. Keith was employed by the Party from June 19, 2013 to March 31, 2014, when she was terminated as a result of her complaints about the discriminatory treatment she received in the workplace on account of her race.

3.     Ms. Keith has satisfied all of her administrative pre-requisites to filing. On July 7, 2014, Ms. Keith received her Notice of Right to Sue from the Unites States Equal Opportunity Employment Commission, a copy of which is attached hereto as **"Exhibit A."**

**JURISDICTION AND VENUE**

4.     The jurisdiction of this Court in invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) and 28 U.S.C. §§ 2201 and 2202.

5.     This Court is an appropriate venue for all of Ms. Keith's claims under 28 U.S.C. §§ 1391(b) and 1391(d) because the Party conducts business in this district and division and the Defendants' unlawful actions and practices alleged herein were committed within the Northern District of Georgia.

**THE PARTIES**

6.     Ms. Keith is a citizen of the State of Georgia and a resident of Hall County, Georgia. She submits herself to the jurisdiction of this Court.

7.      Defendant Padgett is a citizen of the State of Georgia.  Padgett is sued in his official capacity as the Chairman of the Party and may be personally served with process by delivering a copy of the Complaint and summons to him at his place of business at the Party: 3110 Maple Drive, Suite 150, Atlanta, Georgia 30305.

8.      Defendant Georgia Republican Party is a registered political party as defined under Georgia law, O.C.G.A. §§ 21-2-2(25) and 21-2-110.  The Party transacts business in the Northern District of Georgia and is primarily based out of offices located at 3110 Maple Drive, Suite 150, Atlanta, Georgia 30305, and may be served with process by delivering a copy of the Complaint and summons to its Chairman and Chief Executive Officer, John Padgett.

9.      Defendant Georgia Republican Party, Inc., is a Georgia non-profit Corporation.  Defendant Georgia Republican Party, Inc., transacts business in the Northern District of Georgia and may be served with process by delivering a copy of the Complaint and summons to its registered agent, Anne Lewis, 1170 Peachtree Road, Suite 2200, Atlanta, Georgia, 30309.

10.    Upon information and belief, Georgia Republican Party, Inc., is a successor-in-interest to the Georgia Republican Party.  Given that the adverse actions against Ms. Keith occurred both before and after the creation of the

Georgia Republican Party, Inc., Ms. Keith alleges that both entities are responsible for the unlawful conduct alleged herein.

## THE FACTS

11.    Ms. Keith is a supporter of the Georgia Republican Party, and has worked in various volunteer jobs within the organization, including, but not limited to, the Hall County Republican Party, Michael Hardin's legislative office located in the Capitol, and as an unpaid intern for a Republican radio personality.

12.    In or around May of 2013, Ms. Keith was asked by one of the persons for whom she interned if she would consider working for Padgett, the newly elected chairman of the Party.

13.    In June 2013, Ms. Keith began her employment with the Party as the Executive Assistant to Chairman Padgett.  Ms. Keith's supervisor at the Party was Adam Pipkin ("Pipkin").

14.    In her position as Padgett's assistant, Ms. Keith's job responsibilities included maintaining Padgett's calendar, answering the phones during the day, and attending all events with Padgett as his escort.  In addition, Ms. Keith was required to attend events that were sponsored by the Party and to assist wherever she was needed.

15.     Initially, Ms. Keith worked well with her co-workers, and received commendations on her work performance.  However, it soon became clear that Ms. Keith's race set her apart from her co-workers, and she was treated differently throughout her employment.

16.     In or around August of 2013, Ms. Keith was in the office working with a group of volunteers.   Karen Hentschel ("Hentschel"), the Party's Accounting Director, saw the group of volunteers walk by her office and appeared annoyed by Ms. Keith.   Hentschel then stated:   "What the fuck are they doing here?"  Hentschel's statement was made in front of Ms. Keith's co-workers and the group of volunteers.  Ms. Keith had never heard Hentschel speak in this manner to anyone in the office.

17.     When Ms. Keith went to speak to Hentschel about her offensive comment in the workplace, Hentschel replied that Ms. Keith was walking around the office like she was the "Queen Bee."

18.     Ms. Keith was upset about this conversation and tried to speak to Pipkin about what happened.   After Pipkin ignored her report, Ms. Keith asked Hentschel to join her for lunch, which Hentschel accepted and then canceled.

19.     In the Fall of 2013, Ms. Keith was again confronted by Hentschel who chastised her for parking in the spaces located in front of the building which were

reserved for visitors and Padgett.  Ms. Keith advised Hentschel that Padgett had told her she could park in his spot when he was not in the office.  Hentschel persisted in chastising Ms. Keith and demanded that she park on the side of the building. Hentschel was not Ms. Keith's supervisor.

20.    Ms. Keith was dumbfounded at Hentschel's aggressive statements about the parking spots because she knew the Party did not have assigned parking (except for the spot reserved for the Chairman) because there were not enough reserved spots to accommodate all of the employees who worked for the Party.

21.    Ms. Keith went to discuss the issue with Pipkin who told her that there were no assigned parking spots and that she should park wherever she wanted to park, including in the front of the building.  Ms. Keith complied with Pipkin's directive and again parked in front of the building when she arrived to work.

22.    Hentschel persisted and confronted Ms. Keith again when she arrived at work, stating "I told you not to park in front of the building."

23.    Ms. Keith did not want issues with her co-workers, so she began to park on the side of the building in the spots reserved for the Party.

24.    One day in or around October of 2013, Ms. Keith parked in a spot on the side of the building and left the spot when she left for lunch. When she returned, Margaret Poteet ("Poteet"), the Party's recently hired Finance Director,

had parked in the spot Ms. Keith had previously used that morning.  Ms. Keith

thought nothing of it and parked where she could find a spot.

25.    The next day, when Ms. Keith pulled into a space on the side of the

building, Hentschel suddenly banged on Ms. Keith's window and told her not to

park in that spot either, because it "belonged" to Poteet, and Poteet was "upset"

about Ms. Keith parking in "her" spot.

26.    Ms. Keith then went to speak to Poteet, as Ms. Keith was undeniably

upset and confused.  When Ms. Keith relayed Hentschel's comments to Poteet she

(Poteet) replied that she was not upset, that it was only a parking spot, and they did

not have assigned parking.

27.    That same day, Ms. Keith received an email from another co-worker,

demanding to know why Ms. Keith was parking in "Margaret's spot."

28.    Ms. Keith again went to try to talk to Pipkin who was visibly

annoyed.  Pipkin instructed Ms. Keith to not "make trouble" with Poteet and

Hentschel and suddenly directed Ms. Keith to park in the last available spot at the

end of all of the spaces for the Party.

29.    Pipkin issued this directive to Ms. Keith even though he was well

aware she was often worked later than the other employees. For example, on

Friday afternoon all of the employees were allowed to leave early with the exception of Ms. Keith.

30.     This discriminatory behavior then permeated the rest of Ms. Keith's employment up until the date of her termination. Ms. Keith was repeatedly treated differently and put in demeaning situations by her co-workers.

31.     For example, all of the staff was required to attend the events for the Party.  Ms. Keith would often arrive early only to find out that Poteet, who was responsible for making assignments for Party events, refused to assign Ms. Keith any tasks to handle at a given event.

32.     In at least one instance, when Ms. Keith inquired as to her job duties for the function, she was told by Poteet that she could "clean up."

33.     At the Chairman's Dinner in 2013, Ms. Keith was expected to attend as the Chairman's escort and aide.  When Ms. Keith arrived, however, Poteet had given the post to a white male.  After Ms. Keith arrived, she checked her email and saw that Poteet had prepared an excel sheet with the assignments for the dinner and that she (Ms. Keith) was left off.

34.     Ms. Keith was again humiliated as she knew that in previous years, the Chairman's executive assistant attended the dinner as the Chairman's escort and aide, based on several conversations Ms. Keith had with former Chairperson

Sue Everhart's assistant who had given Ms. Keith pointers on how to be a good assistant to Padgett.

35.    Ms. Keith complained to Pipkin about the treatment she received at the Chairman's dinner, but he refused to listen to her.  Instead, Pipkin responded by telling her that she made a mistake by seating a black member of the Republican Party at the head table with the Chairman.  Ms. Keith explained that she was just doing what she was told because Hentschel told her to "fill the fucking seats" when Ms. Keith asked about an empty seat at the Chairman's table, but Pipkin ignored her.

36.    Around the same time period as the Chairman's Dinner, Ms. Keith overheard Poteet complaining to Hentschel about her (Ms. Keith).  Hentschel responded, "Don't worry about her; she is just the house nigger."

37.    Shortly thereafter, Ms. Keith arrived at an event at the Augusta Country Club where, yet again, there were no tasks assigned to her.  Incredibly, Hentschel approached her and asked her why she even showed up at the event, as if Ms. Keith had no business being there.  Ms. Keith was again humiliated, as she had driven from Gainesville to Augusta to attend the event with her husband.

38.     Ms. Keith tried to discuss all of these issues with Pipkin, but he refused to intervene on her behalf, repeatedly telling her that it was something she did or created that cause the conduct.

39.     For example, when Ms. Keith attended a function in Marietta, Ga. Poteet ordered her to stand by a table as if she was a member of the wait staff because she (Poteet) forgot the place cards and did not want anyone to sit there. When Ms. Keith told Pipkin about this treatment, he criticized her use of grammar and punctuation in Padgett's calendar.

40.     Shortly thereafter, Ms. Keith received paperwork at her home from the State of Montana which notified her that the Party would be required to garnish Ms. Keith's wages for restitution she owed for a felony she pled guilty to in 2002.

41.     After receiving the paperwork, Ms. Keith called Hentschel, the Party's Accounting Director, informed her of the garnishment, and explained that she did not intend to contest the garnishment as she wanted the funds to be withdrawn immediately from her paycheck in order to satisfy the balance of the garnishment.

42.     After Ms. Keith notified Hentschel of the garnishment, Ms. Keith overheard a conversation between Poteet and Hentschel taking place before a staff meeting, in which Poteet stated, "I didn't even know there were black people in Montana."

43.    Four days later, Ms. Keith received an email from Hentschel notifying Ms. Keith that the Party received the garnishment. Upon receiving Hentschel's email, Ms. Keith suddenly realized that the racist comments made at the staff meeting about blacks in Montana were about her and that, obviously, Hentschel had told Poteet about her garnishment.  Ms. Keith was humiliated as the comment was made in an open forum where other employees were beginning to assemble for the meeting, and Poteet and Hentschel were again disparaging her because of her race.

44.    By February 3, 2014, Ms. Keith had had enough of the treatment she received in the office and her supervisor's failure to intervene on her behalf. Ms. Keith was furious about the manner in which she was treated with respect to her garnishment and about her co-workers' racist comments about black people in Montana.  Ms. Keith knew that other white employees would not have been subjected to such an open discourse about their personal confidential matters in the workplace.

45.    That day, Ms. Keith sent an email to Pipkin complaining about the treatment she received, including the handling of her garnishment paperwork, the racial slurs and innuendo in the workplace, and the racially discriminatory and offensive treatment she had endured in the workplace.

11

46.     In the February 3, 2014 email, Ms. Keith reminded Pipkin that she had attempted to discuss the treatment with him before, referring to "the countless occasions where I have come to you instance after instance but to no avail."

47.     In the February 3, 2014 email, Ms. Keith informed Pipkin that she:

refuse[d] to be anyone's punching bag or trash can for their issues for reasons that I know have nothing to do with my job performance. Honestly, maybe some people think I  work here only because I am black and of course not valued and therefore consistently harassed and evidenced to you on a number of occasions. . . that is against the law as well sir.

48.     Ms. Keith further informed Pipkin in the February 3, 2014 email that she had "overheard racial slurs in conversations about myself."  Ms. Keith went on to say, ". . . [the amount of] racist innuendo around the office more than I would like to admit to."

49.     Pipkin only responded to the portion of the email where Ms. Keith was distressed about the garnishment paperwork.  At no time did Pipkin ask Ms. Keith about the racial comments and treatment she received in the workplace.

50.     Within days of the email exchange on February 3, 2014, Pipkin and Ms. Keith met in the office.

51.     In that meeting, Ms. Keith explained to Pipkin she was so upset about the garnishment paperwork due to the comments that Hentschel made to Poteet the day of the staff meeting about black people in Montana. Ms. Keith explained her

feelings that her garnishment should not have been discussed with Poteet, and it was yet another instance where her race set her apart from the other people in the office.

52.    At no time did Ms. Keith object to the employees or the Party discussing her status as a convicted felon, as this was not something she sought to conceal from any of her employers.  Ms. Keith was referred to the Party by a radio personality for whom she had interned during a political campaign, and Ms. Keith had told the radio personality about her conviction the moment she learned that she was being considered for the intern position.  Through this radio personality, the Party was aware of Ms. Keith's felony conviction prior to receiving the garnishment.

53.    In the meeting after the February 3, 2014 email, Pipkin agreed that Poteet had no reason to be told about Ms. Keith's garnishment, and he told Ms. Keith that she must have "misunderstood" the comments because Poteet "would not have made comments of this nature."

54.    In that meeting, Ms. Keith reported the other treatment she was subjected to on account of her race, including the racial slurs and discriminatory treatment she received from her co-workers.  However, upon hearing Ms. Keith's

complaints, Pipkin ignored her report and appeared to back up the employees by defending their actions as something Ms. Keith must have "misunderstood."

55.    At the conclusion of the conversation, Ms. Keith reiterated her complaints about rampant racist comments in the workplace and about the treatment she received by her co-workers.

56.    Ms. Keith specifically stated at that meeting, "If I have to endure racist conduct at the Party, I do not want to work here."

57.    After Ms. Keith's written and verbal complaints of racism in the workplace, neither Pipkin nor anyone else at the Party conducted any type of investigation into her allegations.  In fact, Ms. Keith's complaints were ignored and never spoken of again by her supervisor.

58.    Instead, within a few weeks after Ms. Keith complained about the discriminatory comments and actions in the workplace, she received two emails from Pipkin wherein he found fault with her allegedly poor performance in the office and at a charity event.

59.    On March 31, 2014, Mr. Keith was terminated for purported performance issues.

60.     Throughout the duration of her employment at the Party, Ms. Keith never received any disciplinary action or formal write ups for her alleged performance related issues.

## COUNT I

## Race Discrimination – 42 U.S.C. § 1981

61.     Ms. Keith incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

62.     At all times material to this Complaint, Ms. Keith and the Party were parties to an employment agreement under which Ms. Keith provided services to Defendants, and Defendants were required to, among other things, compensate her for her services.

63.     Ms. Keith performed her obligations under this employment agreement.

64.     Defendants' above-pled discriminatory conduct toward Ms. Keith constitutes intentional and unlawful race discrimination against Ms. Keith's rights, in violation of 42 U.S.C. § 1981.

65.     By failing and refusing to conduct an investigation into Ms. Keith's allegations of discriminatory conduct in the workplace, Defendants ratified and condoned the discriminatory behavior of its employees.

66.     As a result of Defendants' unlawful actions, Ms. Keith has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, damage to her reputation, and other indignities, in an amount to be proven at trial.

67.     Defendants willfully and wantonly disregarded Ms. Keith's rights, and Defendants' discrimination against Ms. Keith was undertaken in bad faith and with reckless indifference to Ms. Keith's rights which entitles Ms. Keith to punitive damages pursuant to 42 U.S.C. §1981.

68.     Ms. Keith is entitled to her reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## **COUNT II**

### **Retaliation in violation of 42 U.S.C. § 1981**

69.     Ms. Keith incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

70.     Defendants' actions in terminating Ms. Keith's employment following her complaints of discrimination were committed with reckless disregard for Ms.

Keith's right to be free from discriminatory treatment on account of her opposition to discriminatory practices and in violation of 42 U.S.C. § 1981.

71.    The unlawful actions taken against Ms. Keith have caused her to suffer both monetary and non-monetary damages.

72.    Accordingly, Ms. Keith is entitled to the equitable and monetary relief set forth in the following prayer for relief for Defendants' violation of her rights under the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981.

73.    Defendants willfully and wantonly disregarded Ms. Keith's rights, and Defendants' unlawful actions against Ms. Keith were undertaken in bad faith and with reckless indifference to Ms. Keith's rights which entitles Ms. Keith to punitive damages pursuant to 42 U.S.C. §1981.

74.    Ms. Keith is entitled to her reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT III

### Retaliation in Violation of Title VII

75.    Ms. Keith incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

76.     Defendants terminated Ms. Keith in retaliation for her complaints that she was subjected to discrimination on account of her race and that Defendants engaged in illegal discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*

77.     The unlawful actions taken against Ms. Keith have caused her to suffer both monetary and non-monetary damages.

78.     Ms. Keith is entitled to an award of back pay, and benefits, compensatory damages, attorney's fees, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII, including 42 U.S.C. §§ 1981a and 2000e-5.

79.     Defendants willfully and wantonly disregarded Ms. Keith's rights, and Defendants' unlawful actions against Ms. Keith were undertaken in bad faith and with reckless indifference to Ms. Keith's rights which entitles Ms. Keith to punitive damages pursuant to 42 U.S.C. §1981a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a TRIAL BY JURY and requests the following relief:

(a)     That Plaintiff be awarded a declaratory judgment that Defendants are in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e, *et. seq.*;

(b)     That Plaintiff be granted judgment against Defendants, as requested, under Counts I, II, and III;

(c)     That this Court issue a permanent injunction against Defendants, prohibiting them from engaging in any employment practice or policy which discriminates against others similarly situated to Plaintiff because of their race and/or opposition to discriminatory or unlawful practices, or because of their participation in this lawsuit;

(d)     That Plaintiff be reinstated to her position, or in the alternative, that she be awarded front pay;

(e)     That Plaintiff recovers from Defendants back pay, benefits, and any other equitable relief that is owed, with prejudgment interest thereon;

(f)     That Plaintiff has and recovers compensatory damages in an amount to be determined by a jury;

(g)     That Plaintiff has and recovers punitive damages against Defendants in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future, as to be determined by a jury;

(h)     That Plaintiff has and recovers her costs in this action and reasonable attorneys' fees as provided by law; and

(i)     Any and other such further relief that this Court or the Finder of Fact deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues triable by jury.

(Remainder of page left intentionally blank.  Signatures on the following page.)

Respectfully submitted this 8th day of July, 2014.

**THRASHER LISS & SMITH, LLC**

/s/ *Kimberly A. Worth*
Kimberly A. Worth
Georgia State Bar No. 500790
kworth@tlslaw.com
D. Barton Black
Georgia State Bar No. 119977
bblack@tlslaw.com
Katy Aultman
Georgia State Bar No. 359702
kaultman@tlslaw.com

*Attorneys for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
Telephone: (404) 760-6000
Facsimile: (404) 760-0225

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.l (B).

Respectfully submitted this 8th day of July, 2014.

**THRASHER LISS & SMITH, LLC**

By:     <u>/s/ *Kimberly A. Worth*</u>
Kimberly A. Worth
Georgia State Bar No. 500790
kworth@tlslaw.com
D. Barton Black
Georgia State Bar No. 119977
bblack@tlslaw.com
Katy Aultman
Georgia State Bar No. 359702
kaultman@tlslaw.com

*Attorneys for Plaintiff*

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
Telephone: (404) 760-6000
Facsimile: (404) 760-0225